UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| CURTIS D KEPLINGER, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 2:20-cv-00567-JPH-MG ) |
| RICHARD BROWN, SERGEANT KEITH MCDONALD, STEVE CARPENTER, | ) ) ) ) ) |
| Defendants. | ) |

**ORDER GRANTING IN PART, DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Curtis D. Keplinger sues the warden and two correctional officers for failing to protect him from an assault by the Aryan Brotherhood at Wabash Valley Correctional Facility on November 1, 2018. The defendants have moved for summary judgment. Warden Brown and Sergeant McDonald argue that they were not involved in this incident. Sergeant McDonald and Officer Carpenter argue that they were unaware of the risk of assault and reasonably tried to protect Mr. Keplinger from assault.

The motion for summary judgment is **granted** as to Warden Brown and **denied** as to Sergeant McDonald and Officer Carpenter.

### I. Summary Judgment Standard

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v.*

*Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

## II. Factual Background

### A. Stabbing at Indiana State Prison in October 2015

Mr. Keplinger is a former member of the Aryan Brotherhood. (Dkt. 89-1 at 11-12). In October 2015, one member of the Aryan Brotherhood fatally stabbed another member at Indiana State Prison, where Mr. Keplinger was incarcerated. (*Id.* at 13). Mr. Keplinger was a suspect, and the Aryan Brotherhood put a "green light" on him, meaning a general direction to Aryan Brotherhood members to "[g]et [Mr. Keplinger] in any way at any time you can." (*Id.*).

Mr. Keplinger was transferred to administrative segregation for his own protection. (*Id.* at 15-16). Aryan Brotherhood members in Mr. Keplinger's segregation unit told him to watch out because they were "getting information from the yard that [wasn't] favorable to [him]." (*Id.* at 17, 19). Mr. Keplinger stayed in administrative segregation until he was transferred to Wabash Valley Correctional Facility in March 2017. (*Id.* at 16).

### B. Transfer to Wabash Valley Correctional Facility

For his own safety, Mr. Keplinger was in a segregation unit for his first month at Wabash Valley. (Dkt. 89-1 at 10). Internal Affairs Officer Steve Carpenter said that Indiana State Prison officials had warned that if Mr. Keplinger "hit the yard, that the Aryans were going to try to kill [him]." (*Id.*).

After a month in segregation, Mr. Keplinger asked to be moved to a unit with more freedom. (*Id.* at 27). In April 2017, Mr. Keplinger was transferred to a general population unit. (*Id.* at 24). His cellmate was a member of the Aryan

3

Brotherhood with visible gang tattoos. (*Id.* at 29). Mr. Keplinger kept his own gang tattoos covered to conceal his former membership. (*Id.*).

Mr. Keplinger asked Officer Carpenter to transfer him before his cellmate learned who he was. (*Id.* at 30-32). Officer Carpenter told Mr. Keplinger that he had spoken to his boss, Sergeant McDonald, and that "they couldn't be moving people around . . . because if he did it for one person, he would have to do it for everybody." (*Id.* at 32). Officer Carpenter offered to recommend transferring Mr. Keplinger to a safe location if he gave information about drug trafficking in the prison. (*Id.* at 32-33). Mr. Keplinger declined the offer. (*Id.*).

A couple weeks later, Mr. Keplinger's cell mate learned his identity and attacked him in their cell. (*Id.* at 33-34). A few days later, the cell mate and another Aryan Brotherhood member jumped him in their cell. (*Id.* at 33). Mr. Keplinger told Officer Carpenter that things were "getting hot in [his] cell" and asked to be moved. (*Id.* at 35). Officer Carpenter was dismissive and said that Mr. Keplinger "seemed like [he] was holding up well." (*Id.*).

Sometime later, Officer Carpenter approached Mr. Keplinger and renewed his offer to provide protection in exchange for information. (*Id.* at 37). Officer Carpenter allegedly explained,

> I can't go to my boss and ask him to move you because you don't feel safe or you're having issues because if I did, I would spend all my time moving people around the prison and wouldn't get nothing done. If I go to my boss and tell him Keplinger is going to help us, here's how he did it, let's help him. Let's put him somewhere where he ain't got to look over his shoulder. We can do that. If you're not willing to help us, there's nothing we can do for you.

(*Id.*).

### C. Attempted Assault by Inmate Dockery

Sometime later, either in 2017 or 2018, Mr. Keplinger was transferred to F Cell House. (Dkt. 89-1 at 40-41). During that time, inmate Dockery "befriended [Mr. Keplinger] and earned his trust." (*Id.* at 39). Unbeknownst to Mr. Keplinger, Dockery was actually a member of the Aryan Brotherhood. (*Id.*). One day, Dockery lured Mr. Keplinger into a mop closet and tried to stab him. (*Id.*). Mr. Keplinger escaped. (*Id.* at 43). He submitted a request slip when he got back to his cell and was moved to a general population unit on the other side of the prison the next day. (*Id.* at 43-44).

### D. Transfer to G Cell House

After Mr. Keplinger was transferred out of F Cell House, for a time his cell mate was not an Aryan Brotherhood member. During that time, he does not recall receiving any physical threats, and he did not have any physical altercations. (Dkt. 89-1 at 44-46). (*Id.*).

In September 2018, Mr. Keplinger had a meeting with Officer Carpenter. (*Id.* at 46-47; dkt. 94-2 at 13). Officer Carpenter told him "[t]hey had people falling out on drugs in [F Cell House]," and "[h]e wanted to know who had the drugs, who was selling them." (Dkt. 89-1 at 46-47). Mr. Keplinger said he didn't know and went back to his cell. (*Id.*).

The next day, Mr. Keplinger was transferred to G Cell House.[1] (*Id.*). Mr. Keplinger describes G Cell House as "a hornet's nest" teeming with Aryan

---

[1] G Cell House was a restricted housing unit. The security level in restricted housing units is somewhere between general population and segregation. Mr. Keplinger had a

Brotherhood members. (*Id.* at 69). According to Mr. Keplinger, "the Aryan Brotherhood lives in certain dorms" at the Indiana Department of Correction. (*Id.*). Some dorms, like G Cell House, are populated with Aryan Brotherhood members, while other dorms, such as the general population unit he was transferred from, are not. (*Id.*).

"A very short time" after he was transferred to G Cell House, inmate Dockery was transferred there as well. (*Id.* at 47). Mr. Keplinger filled out a request slip and asked a correctional officer to pass it to the Sergeant.[2] (*Id.*). The Sergeant told Mr. Keplinger that he was going to "red tag" him, so that he would be locked in his cell until they could move him away from Dockery. (*Id.*).

A few weeks later, Mr. Keplinger was moved to a different range within G Cell House. (*Id.* at 53-54). His new range, the 100 range, was separated by walls from his previous range, the 300 range. (*Id.* at 54). Inmates in the 100 range do not interact with inmates on the 300 range. (*Id.*).

The day Mr. Keplinger was moved to the 100 range, he asked Officer Carpenter if he could be moved to protective custody. (*Id.* at 56). Officer Carpenter said he did not believe Mr. Keplinger needed protective custody. (*Id.*). Mr. Keplinger asked Officer Carpenter for paperwork so he could formally request protective custody, but Officer Carpenter said he didn't have any. (*Id.*). Mr.

---

cell mate. 11 cells would come out at a time and have recreation together. By contrast, a segregation unit is locked down almost 24 hours a day. (Dkt. 89-1 at 47-48).

[2] "The Sergeant" was not Sergeant McDonald. Mr. Keplinger testified that he has never met Sergeant McDonald personally and "wouldn't know if he walked up, started talking to me." (Dkt. 89-1 at 86).

Keplinger was not able to ask for paperwork from another correctional officer because he was locked in his cell on red tag status. (*Id.* at 57).

### E. Assault on November 1, 2018

A few days after Mr. Keplinger was moved to the 100 range, his red tag was removed. (Dkt. 89-1 at 55). The assault giving rise to this lawsuit occurred one or two days later. (*Id.*).

On November 1, 2018, Mr. Keplinger walked to a kiosk to send an email. (*Id.* at 60-61). A few members of the Aryan Brotherhood came up from behind and beat him with fan motors, which are steel tubes weighing 2 or 3 pounds. (*Id.* at 61). Mr. Keplinger tried to defend himself with a milk crate. (*Id.* at 63). After the assault, Mr. Keplinger was "covered in blood," his "ear was hanging," and he couldn't walk. (*Id.* at 64-65). A nurse came into the cell house, put him in a wheelchair, and took him to the medical unit. (*Id.* at 65).

### F. Warden Brown

Warden Brown has "no specific recollection of being informed about anything related to Keplinger's safety" when he was transferred to Wabash Valley in March 2017. (Dkt. 89-5 at 1-2). He has "no specific recollection of ever personally taking action to anything related to Keplinger's safety. Any investigation into potential threats to Keplinger's safety at [Wabash Valley] would have been handled by the" Office of Investigations and Intelligence ("OII"). (*Id.* at 2; *see* dkt. 89-5 at 2). As a matter of prison policy, "OII will conduct investigations into any alleged safety and/or security threat brought by any inmate, and, once

the alleged threat is analyzed and examined by OII, the OII can unilaterally take action as it deems necessary." (*Id.* at 5).

Warden Brown "would not have ever received JPay emails from [Mr. Keplinger] as offenders could not JPay email the warden." (*Id.*). If he had received a letter or other correspondence from Mr. Keplinger regarding his safety, Warden Brown "would've given it to the OII for them to investigate the issue, assess any potential threats, and take action as necessary." (*Id.* at 3). Warden Brown does not know why Mr. Keplinger was moved to G Cell House in September 2018. (*Id.* at 4). Bed moves would have been handled by the unit team staff and the OII if there was a security threat group involvement. (*Id.*).

### G. Sergeant McDonald

Sergeant McDonald was not employed at Wabash Valley when Mr. Keplinger was transferred in March 2017. (Dkt. 89-4 at 1). He returned to the facility in October 2017. (*Id.*).

Sergeant McDonald has "no recollection regarding any risk to Keplinger specifically." (*Id.* at 2). But he also states that Mr. Keplinger "was offered protective custody, which he refused." (*Id.*). According to Sergeant McDonald, "OII staff never exchanged information from offenders for their safety and security, nor was their safety and security ever used as a bargaining chip." (*Id.* at 3).

### H. Officer Carpenter

Officer Carpenter remembers that in March 2017, "OII received a note from the [Wabash Valley] classification director informing us that Plaintiff Keplinger

8

was going to be transferred here, and the note stated that Keplinger appeared to have some trouble with the Aryan Brotherhood." (Dkt. 89-2 at 1). Officer Carpenter says that Mr. Keplinger was removed from segregation because "OII could never substantiate any of Plaintiff's claims with the Aryan Brotherhood." (*Id.* at 3).

In one interrogatory response, Officer Carpenter says that Mr. Keplinger "was moved around the facility on various occasions, however this was partially caused by Plaintiff's own conduct and was unrelated to his safety concerns." (*Id.* at 2). But in another response, to the question, "What action if any did you take in regards to Curtis Keplinger's safety?", Officer Carpenter answered, "He was moved around the facility on various occasions, and he was also offered protective custody on various occasions and he denied." (*Id.* at 5).

### I. Mr. Keplinger's Written Correspondence

On July 17, 2018, the warden's office received a letter from Mr. Keplinger describing his history with the Aryan Brotherhood. (Dkt. 94-2 at 3). The letter mentions the stabbing at Indiana State Prison in 2015, the incident with Dockery in the mop closet, and offers from "IA" to provide protection in exchange for information about drug trafficking. (*Id.*). The letter states that Mr. Keplinger was in P Cell House and did not feel safe. (*Id.*).

On October 10, 2018, while Mr. Keplinger was in G Cell House, he sent a JPay email asking, "how can you put me back in a cell house with a guy that [tried] to stab me?" (Dkt. 97-1 at 2) (cleaned up). On October 17, 2018, Mr. Keplinger sent another JPay email stating, "I don't understand why you have left

9

me in this cell house. Now I've been labeled a snitch, check in and it now is deeper than just the men that tried to stab me. Why is my safety and wellbeing being pushed to the side and ignored? Your office has well documented these issues as down state and my lawyer something has to be done." (*Id.* at 1) (cleaned up). Both JPay emails were received by Sergeant McDonald. (*Id.*).

On October 24, 2018, Mr. Keplinger sent another JPay email reiterating his safety concerns: "The Aryan Brotherhood has influence with other gangs, and has them all thinking I'm a snitch and working for IA. I can in no way stay or live in this cell house. Why have I not been moved to another cell house on the other side of the prison or transferred to another prison?" (Dkt. 94-2 at 1) (cleaned up). Sergeant McDonald forwarded this email to Officer Carpenter and several other IDOC officials, saying "Carp please follow up/respond." (*Id.*).

On October 19, 2018, Mr. Keplinger sent a JPay email to a person outside the prison. (Dkt. 89-3). The email says, "I believe I'm ok now they moved me to the other side of the cellhouse, we'll see how things go. Thank you for calling." (*Id.*) (cleaned up).

### III. Discussion

#### A. Failure to Protect Standard

Prison officials must protect prisoners from assaults by other inmates. *Farmer v. Brennan,* 511 U.S. 825 (1994). But prison officials can be liable for failure to protect an inmate only if the official 'knows of and disregards an excessive risk to inmate health or safety.'" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (quoting *Farmer,* 511 U.S. at 837 (1994)). A claim that a

10

prison official was deliberately indifferent to such a risk therefore has both an objective and a subjective component.

First, the harm to which the prisoner was exposed must be an objectively serious one. *See Gevas,* 798 F.3d 475 (being stabbed by cellmate constitutes serious harm); *Brown v. Budz,* 398 F.3d 904, 910 (7th Cir. 2005) ("a beating suffered at the hands of a follow detainee … clearly constitutes serious harm").

Second, "the official must have actual, and not merely constructive, knowledge of the risk in order to be held liable; specifically, he 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.'" *Gervas,* 798 F.3d at 481 (*quoting Farmer,* 511 U.S. at 837). In addition to knowing that the inmate faced a substantial risk of serious harm, an official will only be liable when he disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 847; s*ee also Borello v. Allison,* 446 F.3d 742, 747 (7th Cir. 2006).

### B. Analysis

Mr. Keplinger describes a years-long threat to his safety from the Aryan Brotherhood, during which he suffered multiple assaults. (Dkt. 89-1). But this lawsuit is only about the assault that occurred on November 1, 2018. (Dkts. 2, 15). Thus, the Court will only consider whether the defendants are liable for that assault.

### 1. Warden Brown

"Individual liability under § 1983 requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657

(7th Cir. 2017) (cleaned up). Here, the designated evidence does not support a reasonable conclusion that Warden Brown was personally involved in this incident, or that he was subjectively aware of a risk to Mr. Keplinger's safety in G Cell House.

For wardens and other high-level government officials, "mere knowledge of a subordinate's misconduct is not enough for liability." *Vance v. Rumsfeld*, 701 F.3d 193, 203 (7th Cir. 2012) (en banc). Indeed, "inaction following receipt of a complaint about some else's conduct is [insufficient]." *Estate of Miller by Chassie v. Marberry*, 847 F.3d 425, 428 (7th Cir. 2017). A prisoner may not rope high-level officials into a lawsuit simply by sending them letters. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("[The plaintiff's] view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor . . . and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right.").

The warden may be liable, however, if he was actually engaged with the underlying issue. *E.g.*, *Haywood v. Hathaway*, 842 F.3d 1026, 1032-33 (7th Cir. 2016) (Warden could be liable for cold prison conditions because he "had actual knowledge of the unusually harsh weather conditions . . . had been apprised of the specific problem with the physical condition of [the plaintiff's cell] . . . and, during the time period of [the plaintiff's] complaint, the warden toured the

segregation unit himself."). Or he may be liable if the issue was his direct responsibility, rather than a subordinate's responsibility. *E.g., Gray v. Hardy*, 826 F.3d 1000, 1008 (7th Cir. 2016) (Warden was personally responsible for the cell conditions because he "not only knew about the problems but was personally responsible for changing prison policies so that they would be addressed.").

In this case, Warden Brown was not personally involved in offender bed moves or safety issues with prison gangs, as such tasks were delegated to OII officers like Officer Carpenter and Sergeant McDonald. (Dkt. 89-5 at 4-5). He also lacked personal knowledge that Mr. Keplinger was at risk of assault in G Cell House. Mr. Keplinger raised the issue of his safety in G Cell House in three JPay emails in October 2018. (Dkt. 94-2 at 1; dkt. 97-1). But the undisputed evidence is that Warden Brown did not receive these emails, and there is no evidence that the emails or their contents were ever passed on to him. (Dkt. 89-5 at 2).

Mr. Keplinger sent a letter to the warden's office raising general complaints about his safety in July 2018. (Dkt. 94-2 at 3). There is no evidence that Warden Brown actually read this letter. Also, Mr. Keplinger testified at his deposition that he had enjoyed a period of peace and safety in the months before his transfer to G Cell House in September 2018. (Dkt. 89-1 at 44-46). There is no evidence that Warden Brown knew he had been transferred to G Cell House or that G Cell House was a "hornet's nest" filled with Aryan Brotherhood members.

Warden Brown's motion for summary judgment is **GRANTED**.

13

### 2. Sergeant McDonald and Officer Carpenter

#### i. Sergeant McDonald's Involvement

Sergeant McDonald argues that he's entitled to summary judgment because (1) he "did not receive" Mr. Keplinger's emails "personally through JPay"; (2) Mr. Keplinger was "unaware of the role that [Sergeant McDonald] played in his transfers from one housing unit to another"; and (3) there "is no evidence that Defendant McDonald had knowledge of the threats to Plaintiff's safety or had any involvement in Plaintiff's movement." (Dkt. 90 at 9-10).

However, there's designated evidence that Sergeant McDonald received JPay emails from Mr. Keplinger expressing his safety concerns on October 10, October 17, and October 24, 2018. (Dkt. 94-2 at 1; dkt. 97-1). On October 25, 2018, he forwarded the last JPay email to Officer Carpenter. (Dkt. 94-2 at 1). Moreover, Warden Brown stated that "[a]ny investigation into potential threats to Keplinger's safety at [Wabash Valley] would have been handled by the OII"; that "[o]ffender bed moves would have been handled by the unit team staff and the OII if there was security threat group involvement"; and that "[t]he OII will conduct investigations into any alleged safety and/or security threat brought by any inmate, and, once the alleged threat is analyzed and examined by OII, the OII can unilaterally take action as it deems necessary." (Dkt. 89-5 at 2-5).

The JPay emails and Warden Brown's statement support a reasonable conclusion that Sergeant McDonald had actual knowledge of the risk to Mr. Keplinger's safety in G Cell House in the weeks leading up to the assault on November 1, 2018, that he was empowered to investigate the threat to

14

Mr. Keplinger's safety, and that his office could have unilaterally moved Mr. Keplinger or taken other appropriate action to protect him.

### ii. Deliberate Indifference

Sergeant McDonald and Officer Carpenter both argue that Mr. Keplinger "did not know the names of the inmates who attacked him on November 1, 2018, and had never interacted with them before. Therefore, there was no way for Defendants to know that those specific inmates posed a credible threat to Plaintiff other than the fact that they were Aryan Brotherhood members." (Dkt. 90 at 9-10) (internal citations removed).

They also argue that they acted reasonably before the assault, including by previously "red tagging" Mr. Keplinger when he needed to be moved to a different range away from inmate Dockery. (*Id.* at 9).

These arguments are foreclosed by the Seventh Circuit's decision in *Sinn v. Lemon*, 911 F.3d 412 (7th Cir. 2018). Sinn was attacked by two members of the Vice Lords gang at an Indiana prison. *Id.* at 415-16. Prison officials investigated and moved him to another dormitory. *Id.* at 416. Sinn believed that the issue was not resolved because he was still around Vice Lord members, remained unaffiliated, and was susceptible to racially motivated violence. *Id.* He told defendant Brush, who had facilitated his move to the new dormitory, about a verbal threat from two Vice Lord members upon his arrival in the new dorm. *Id.* at 417. He did not identify the Vice Lord members by name. *Id.* He also sent Brush a letter describing the threat of assault. *Id.* at 417. The letter did not identify the assailants by name, or mention the Vice Lords specifically, but it

15

described Sinn's fears of racially motivated violence and his history of assaults and verbal threats. *Id.* In response, Brush did nothing, and Sinn was later assaulted by two gang members. *Id.*

The Seventh Circuit rejected Brush's argument that Sinn's oral complaint and letter lacked sufficient specificity:

> it is well-settled that plaintiffs can adequately establish deliberate indifference in circumstances where the *specific* identity of the ultimate assailant is not known in advance of assault. Indeed, an official cannot escape Eighth Amendment liability merely by showing he did not know the inmate was especially likely to be assaulted by the specific prisoner who eventually committed the assault. This is so because it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk. Rather, what matters is the relevant defendant's subjective awareness, which includes the inmate's complaints along with any other information that defendant may have.

*Id.* (cleaned up) (quoting *Farmer*, 511 U.S. at 843).

Thus, it does not matter that Mr. Keplinger did not know the names of the specific gang members who ultimately assaulted him. Nor is it dispositive that Carpenter and McDonald had taken some action to protect him in the past (*i.e.* "red tagging" him and moving him to the 100 range)—in *Sinn*, Brush had moved Sinn to another dormitory after the first attack, but that did not necessarily insulate him from liability for the second attack. *See id.*

Moreover, in cases of long-term "prevalent gang violence," the Seventh Circuit has cautioned against taking "too narrow a view of failure-to-protect claims." *Id.* Defendants therefore must continue to "reasonably respond to abate [the] risk of harm to the victim" when "it is reasonable to infer" that they know

16

of that risk. *Id.* Here, given Mr. Keplinger's long history with the Aryan Brotherhood, the defendants' familiarity with prison gangs through their positions with the OII, their awareness that Mr. Keplinger was at risk of assault from the Aryan Brotherhood, Mr. Keplinger's characterization of G Cell House as a "hornet's nest" filled with Aryan Brotherhood members, Mr. Keplinger's testimony that Officer Carpenter repeatedly withheld protection because he would not provide information on drug trafficking, Mr. Keplinger's Jpay message from about a week before the assault that he needed to be moved out of G cell house entirely, and Mr. Keplinger's testimony that Officer Carpenter refused his request for protective custody a few days before the November 1 assault, a reasonable jury could conclude that Sergeant McDonald and Officer Carpenter were deliberately indifferent to his risk of assault. Accordingly, their motion for summary judgment is **DENIED**.[3]

## IV. Motion to Seal

Mr. Keplinger has moved to seal this case, arguing that leaving the case open to the public could put him at risk for "snitching." (Dkt. 83). The defendants oppose this motion, noting the presumption in favor of letting court records be open to the public and that, unlike the victim in a criminal case, Mr. Keplinger has voluntarily brought this lawsuit. (Dkt. 85 citing *Bond v. Ulteras*, 585 F.3d

---

[3] Sergeant McDonald and Officer Carpenter also argue that Mr. Keplinger's October 29 JPay email to an outside person, stating, "I believe Im ok now they moved me to other side of the cellhouse, we'll see how things go," (dkt. 89-3), supports summary judgment. This email is not dispositive. It does not establish the *defendants'* subjective belief about Mr. Keplinger's risk of assault, and Mr. Keplinger argues that he sent the email to calm this person, who was worried about his safety. (Dkt. 94 at 10).

17

1061, 1073-74 (7th Cir. 2009) ("[C]ourts are public institutions that operate openly"); *Dole v. Indiana Black Exp*, 923 F. Supp. 137, 143 (S.D. Ind. 1996) ("Unlike, for example, the victim in a criminal case, [plaintiff] has not been caught up unwillingly in litigation in public courts but has instead chosen to initiate this action.")).

The motion to seal, dkt. [83], is **denied**. The Seventh Circuit recently affirmed a district court order denying a motion to seal its dispositive final order in a social security disability appeal. *Mitze v. Saul*, 968 F.3d 689 (7th. Cir. 2020). Mitze asked the court to seal her "medical information . . . and all other information pertaining to [her] case" because she had received "harassing phone calls from solicitors" who knew her personal medical information because the court had "publicized" it by affirming the ALJ's order denying her social security disability benefits. *Id.* at 691. The Seventh Circuit explained that there is a "strong presumption . . . in favor of publishing dispositional orders" and that courts often decline to seal cases involving state secrets, trade secrets, and attorney-client privilege, opting instead for limited redaction where appropriate. *Id.* at 692 (citing *Pepsico, Inc. v. Redmond*, 46 F.3d 29, 30 (7th Cir. 1995) (Easterbrook, J., in chambers) (noting that even in cases involving issues of national security, a "sealed opinion and order" is barely imaginable)).

## V. Conclusion

Mr. Keplinger's motion to seal, dkt. [83], is **denied**. The motion for summary judgment, dkt. [88], is **granted** for Warden Brown and **denied** for

Sergeant McDonald and Officer Carpenter. The **clerk shall** terminate Warden Brown as a defendant on the docket.

The remaining claims will be resolved by settlement or trial. Given the challenges of late-stage litigation, the Court **reconsiders and grants** Mr. Keplinger's motion for assistance recruiting counsel. Dkt. [11]. The **clerk is directed** to include the Court's form motion for counsel with Mr. Keplinger's copy of this Order. Mr. Keplinger shall have **21 days from the entry of this Order on the docket** to sign and return the "Requirements for the Recruitment of Counsel."

**SO ORDERED**.

Date: 9/26/2023

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

CURTIS D KEPLINGER
873736
PUTNAMVILLE - CF
PUTNAMVILLE CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Carlton Wayne Anker
Lewis and Wilkins LLP
anker@lewisandwilkins.com

Eric Ryan Shouse
Lewis And Wilkins LLP
shouse@lewisandwilkins.com